UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/22/2025__

DELPHI CRE FUNDING LLC,

              Plaintiff,

       -v-

CHRISTOPHER BEAVOR,

              Defendant.

**REPORT AND RECOMMENDATION**

25-CV-3906 (RMB) (HJR)

**HENRY J. RICARDO, United States Magistrate Judge.**

**To the Honorable Richard M. Berman, United States District Judge:**

Plaintiff Delphi CRE Funding LLC ("Delphi") brings this action to enforce a personal guaranty of a loan. Defendant Christopher Beavor ("Beavor") provided this guaranty for the benefit of Delphi, which serves as the Administrative Agent in the underlying Loan Agreement. Delphi seeks summary judgment in the amount of $69,628,721.49, plus interest, fees, and costs. Beavor opposes this motion and cross-moves to dismiss the claims against him. For the reasons described below, the undersigned respectfully **RECOMMENDS** that Delphi's motion for summary judgment be **GRANTED** as to liability, but **DENIED** as to the quantum of damages, and that Beavor's cross-motion to dismiss be **DENIED**.

## I. BACKGROUND

### A. Factual Background

Beavor is a Nevada real estate developer. ECF No. 16-1 ("Beavor Decl.") ¶ 3. He recruited a group referred to as the "Gryphon Members" to invest in the redevelopment of the site of the former Harrah's Reno Hotel and Casino. ECF No.

1

17 at 9.[1]  Beavor refers to this redevelopment plan as the "RCC Project."  *Id.*

Beavor and the Gryphon Members formed Reno City Center, LLC ("RCC") on

December 11, 2019 as the legal vehicle to pursue the project.  Beavor Decl. ¶ 7.  The

Gryphon Members, who contributed all the initial capital, held a 90% interest in

RCC and Beavor held the remaining 10% interest through Bristlecone Reno, LLC, a

company he controlled.  *Id.*  Another company that Beavor controlled, Bristlecone

Management, LLC ("BCM"), became the sole manager of RCC.  *Id.* ¶ 3.

 To finance the RCC Project, a newly-formed subsidiary of RCC, Reno City

Center Owner, LLC ("RCC Owner" or "Borrower") entered into a loan agreement on

June 16, 2022 (the "Loan Agreement"), with RCC Owner as the Borrower and

Delphi serving as the Administrative Agent for the Lenders.  ECF No. 1-4 ("Mann.

4/7/2025 Aff. I") ¶ 3–4, 11.[2]  RCC Owner borrowed $138,371,187.00 secured by a lien

on the former Harrah's site, defined as the "Property."  *See* ECF No. 16-5 (the "Loan

Agreement") § 2.1.  As additional security for the loan, Beavor provided a Guaranty

of Recourse Obligations (the "Guaranty") for the benefit of Delphi.  The Guaranty,

which is the subject of this case, set forth the terms of Beavor's personal liability for

Borrower's obligations under the Loan Agreement.  *See* Mann 4/7/2025 Aff. I ¶ 11;

Beavor Decl. ¶ 21.

---

[1] The Gryphon Members are all limited liability companies and are identified in footnote one of Beavor's brief.  ECF No. 17 at 7.

[2] Although RCC Owner was the Borrower, the loan proceeds were disbursed to RCC. Beavor Decl. ¶ 17.  RCC assigned its rights in the RCC Project to RCC Owner.  *Id.* ¶ 16 n.1. Neither party claims that the distinction between RCC and RCC Owner is relevant to pending motions.

The Guaranty provides that Beavor "irrevocably and unconditionally guarantees to [Delphi] the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity, or otherwise." ECF No. 16-6 (the "Guaranty") ¶ 1. These "Guaranteed Obligations" are defined as "the payment to [Delphi] of all of the Recourse Liabilities, and . . . upon the occurrence of a Springing Recourse Event, the payment to [Delphi] of the Debt." Guaranty ¶ 1. The Loan Agreement defines the "Debt" to include "the Outstanding Principal Balance, together with all interest accrued and unpaid thereon," certain fees, and "all other sums due from Borrower under the Loan Documents." ECF No. 16-5 at 17.

Accordingly, Beavor's liability for all sums owed by the Borrower is triggered by a "Springing Recourse Event." The Loan Agreement defines this term to include Borrower "filing a voluntary petition under the Bankruptcy Code" and "the occurrence of a Transfer in violation of this Agreement, which such Transfer results in . . . a change in Control of any Restricted Party[.]" Loan Agreement §§ 7.3(c)(i), (iv). RCC Owner is a "Restricted Party" and, for a limited liability company such as RCC Owner, a "Transfer" includes "the change, removal, resignation, or addition of a managing member or non-member manager." Loan Agreement at 25, 28.

The Guaranty states that it "is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." Guaranty § 2. Beavor specifically waived certain rights, including "notice of any default, notice of nonpayment or nonperformance . . . demand for payment or performance and all

other notices and demands with respect to the Guaranteed Obligations and this Guaranty," "any right to revoke [the] Guaranty," and any right to require Delphi to sue or exhaust remedies against Borrower or any other person liable for the Guaranteed Obligations or any portion thereof.  Guaranty § 3.

Beavor further agreed that his obligations under the Guaranty "shall not be released, diminished, or adversely affected by "any adjustment, indulgence, forbearance or compromise that might be granted or given by [Delphi] to Borrower," "the insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower," "any sale, lease or transfer of any or all of the assets of Borrower" or "any changes in the shareholders, partners or members of Borrower" or "any reorganization of Borrower," "and any full or partial release of liability of Borrower for any part of the Guaranteed Obligations . . . it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party[.]"  Guaranty §§ 6(b)–(d), (f).  Specifically, the Guaranty provides:

> [I]t is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, *notwithstanding any occurrence, circumstance, event, action, or omission whatsoever*, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligations shall be deemed satisfied only upon the full and final payment and satisfactions of the Guaranteed Obligations (except for only those obligations which, by their express terms, survive indefeasible repayment of the Debt).

Guaranty § 6(j) (emphasis added).

The Guaranty is governed by New York law, except that federal law governs where New York state law is preempted.  Guaranty § 10.  The Guaranty contains the following forum selection clause:

> Any legal suit, action or proceeding against Administrative Agent, Lender, or Guarantor arising out of or relating to this Guaranty may at Administrative Agent's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

Guaranty § 10 (original in all uppercase and bold).

Between June 2022, when Beavor signed the Guaranty, and June 2023, the relationship between Beavor and the Gryphon Members deteriorated.  ECF No. 17 at 12.  The Gryphon Members became interested in redeveloping the Property as a hotel instead of as apartments as was originally planned.  This change in plans create a conflict for Beavor because he was subject to a restrictive covenant in a separate project that precluded his involvement in another hotel project in Reno.  Beavor Decl. ¶¶ 23–26.  The Gryphon Members also accused Beavor and BCM of malfeasance and financial misconduct.  Beavor Decl. ¶ 29.

On May 8, 2023, the Gryphon Members removed BCM as manager of RCC, and replaced it with RCC Manager, LLC.  This development, as well as BCM's removal as manager of RCC Owner, effectively removed Beavor and his affiliated

5

entities from all management and operational roles in the RCC Project.  *See* Beavor Decl. ¶¶ 30–32.  It appears that BCM's removal as manager also constituted a Springing Recourse Event, which triggered Beavor's liability under the Guaranty. BCM disputed whether it was appropriately removed as manager and commenced arbitration.  Beavor Decl. ¶¶ 32, 35.[3]

On January 5, 2024, Delphi recorded a notice of default and moved to appoint a receiver during anticipated foreclosure proceedings with respect to the Property. Beavor Decl. ¶¶ 42–44.  RCC Owner then filed a voluntary bankruptcy petition in the Bankruptcy Court for the District of Nevada on February 16, 2024.  Mann. 4/7/2025 Aff. I ¶ 12; Beavor Decl. ¶ 45.

Six months later, Delphi entered into a settlement agreement with RCC Owner, which was approved by the Bankruptcy Court on October 18, 2024.  Mann. 4/7/2025 Aff. I ¶ 16.  RCC Owner and Delphi amended their settlement agreement on December 6, 2024, and the Bankruptcy Court approved the amendment on January 10, 2025.  Mann. 4/7/2025 Aff. I ¶¶ 18–19.  Under this settlement, RCC Owner paid Delphi an allowed secured claim in the amount of $47,500,000.00, plus $5,000,000.00 as consideration for the amendment, and Delphi retained an allowed

---

[3] While Beavor contends that BCM's removal was improper, he repeatedly refers to this event as a trigger of his liability under the Guaranty.  *See, e.g.*, ECF 17 at 15 ("there is strong circumstantial evidence that Delphi colluded with Borrower (through the Gryphon Members) to trigger Beavor's liability under the Guaranty by filing the voluntary bankruptcy and/or change of control.").  Regardless of whether it was proper, there was arguably a "Transfer" (*i.e.*, a "change" or "removal" of a "managing member") that caused an effective change of "Control" (*i.e.*, "the power to direct or cause the direction of management") of RCC Owner, which was designated as a "Restricted Party" under the Loan Agreement.  Thus, it appears—and Beavor never directly disputes—that the removal of BCM triggered Beavor's liability for the Debt under the Guaranty.

unsecured claim of $58,904,600.00 that remains unpaid.  Mann. 4/7/2025 Aff. I

¶¶ 14–15, 17–18, 22, 24–25; Beavor Decl. ¶¶ 52, 54–55, 57.

Beavor appeared in the RCC Owner bankruptcy proceeding to object to the

settlement, including on the basis that "the Gryphon Members have developed a

scheme to stick Mr. Beavor with an inflated deficiency claim, which does not equal a

fair and equitable result." *In re Reno City Center Owner LLC*, No. 24-50152, ECF

No. 285 at 62 (Bankr. D. Nev. Oct. 15, 2024).  His objections were overruled.  *Id.* at

63.  Beavor appealed the dismissal of the bankruptcy case, and that appeal remains

pending.  Beavor Decl. ¶ 51.

### B.    Procedural Background

Delphi commenced this action in state court by filing a motion for summary

judgment in lieu of complaint under Section 3213 of the New York Civil Practice

Laws and Rules on April 7, 2025.  ECF Nos. 1-2–1-5.  On May 9, 2025, Beavor

removed this action to federal court based on diversity of citizenship.  ECF No. 1.

Pursuant to a briefing schedule entered by Judge Berman, ECF No. 11,

Beavor filed his cross-motion to dismiss and opposition to Delphi's motion for

summary judgment with supporting documents.  ECF Nos. 16–17.  On July 7, 2025,

Delphi filed its opposition to the cross-motion to dismiss with supporting

documents, ECF Nos. 20–21, and on July 11, 2025, it filed a reply in support of its

motion for summary judgment with supporting documents.  ECF Nos. 22–23.  On

July 25, 2025, Beavor filed his reply in support of his cross-motion to dismiss.  ECF

No. 26.

By Order of Reference, dated July 16, 2025, this action was referred to the undersigned for general pretrial supervision and a report and recommendation on the pending motion for summary judgment and motion to dismiss.  ECF No. 24.

## II.    LEGAL STANDARDS

"Upon removal to federal court, a New York Civil Practice Laws and Rules Section 3213 motion for summary judgment in lieu of complaint is converted to a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure."  *Beaufort Capital Partners LLC v. Oxysure Sys. Inc.*, No. 16-CV-5176, 2017 WL 913791, at *2 (S.D.N.Y. Mar. 7, 2017).

Under the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is material if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Center*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the

facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya,

Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*,

368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary

judgment, the non-moving party may not rely on unsupported assertions,

conjecture, or speculation.  *Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir.

2011).  To defeat a motion for summary judgment, "the non-moving party must set

forth significant, probative evidence on which a reasonable fact-finder could decide

in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*,

477 U.S. 242, 256–57 (1986)).

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration

that, for specified reasons, it cannot present facts essential to justify its opposition,

the court may: (1) defer considering the motion or deny it; (2) allow time to obtain

affidavits or declarations or to take discovery; or (3) issue any other appropriate

order." *Ezrasons, Inc. v. Travelers Indemnity Co.*, 89 F.4th 388, 403 (2d Cir. 2023)

(quoting Fed. R. Civ. P. 56(d)).  "The affidavit or declaration must describe: (1) what

facts are sought and how they are to be obtained, (2) how such facts are reasonably

expected to raise a genuine issue of material fact, (3) what efforts the affiant has

made to obtain them, and (4) why the affiant's efforts were unsuccessful." *Cruz v.*

*AAA Carting & Rubbish Removal, Inc.,* 116 F. Supp. 3d 232, 244–45 (S.D.N.Y. 2015) (citation omitted).

## III.   DISMISSAL UNDER RULE 12(b)(3) SHOULD BE DENIED

Beavor seeks dismissal of this action based on the doctrine of *forum non conveniens*.  ECF No. 17 at 18.  Paragraph 10 of the Guaranty contains a forum selection clause:

> Any legal suit, action or proceeding against
> Administrative Agent, Lender, or Guarantor arising out of
> or relating to this Guaranty may at Administrative
> Agent's option be instituted in any federal or state court
> in the City of New York, County of New York, pursuant to
> Section 5-1402 of the New York General Obligations Law
> and Guarantor waives any objections which it may now or
> hereafter have based on venue and/or forum non
> conveniens of any such suit, action or proceeding, and
> Guarantor hereby irrevocably submits to the jurisdiction
> of any such court in any suit, action or proceeding.

Guaranty § 10 (all uppercase and bold in original).  Because the forum selection clause expressly waives any objection based on *forum non conveniens*, the key question for Beavor's motion is whether this clause is enforceable.

The Second Circuit has established a four-part analysis to determine whether a forum selection clause is enforceable: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive; (3) whether the claims and parties involved in the suit are subject to the forum selection clause; and (4) if the first three inquiries are satisfied and the forum selection clause is presumptively enforceable, whether the

10

resisting party has rebutted the presumption of enforceability. *Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007).

Beavor does not dispute that the forum selection clause was reasonably communicated to him or that the claims and parties involved in this suit are subject to it. ECF No. 17 at 25. The only question that remains in determining whether this clause is presumptively enforceable is whether the forum selection clause is mandatory or permissive.

Beavor argues that the forum selection clause is permissive because it provides that a suit "may" be instituted in courts in New York County "at Administrative Agent's option," and thus confers non-exclusive jurisdiction on these courts. ECF No. 17 at 25–26. This argument ignores the full language of the clause, for it fails to consider that Beavor also agreed to "waive[ ] any objections which [he] may now or hereafter have based on venue and/or forum non conveniens of any such suit . . . [and] irrevocably submit[ ] to the jurisdiction of any such court[.]" Guaranty § 10. Read together, these other portions of the forum selection clause make clear that, while Delphi has an option of where to sue, once it sues in one of the identified courts, that decision binds Beavor because he waives any objection that would allow him to transfer the suit to different courts.

As the Second Circuit has explained, "New York courts have repeatedly held that a facially permissive forum selection clause becomes mandatory when combined with other language of exclusivity in the contractual provisions, such as a waiver of venue and forum objections by the parties." *Flextronics Da Amazonia*

11

*Ltda. v. CRW Plastics USA Inc.*, No. 22-2803, 2023 WL 8270818 at *3 (2d Cir. Nov. 30, 2023) (citing cases).  In that case, even though the clause said that suits "may be brought" in New York City courts, the court concluded that "the forum selection clause, combined with the waiver of venue and forum objections, constitutes a mandatory forum selection clause under New York law that is entitled to a presumption of enforceability." *Id.* at *4.

The cases that Beavor cites to argue otherwise are inapt.  *See* ECF No. 17 at 26.  For example, in *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.*, 22 F.3d 51, 53 (2d Cir. 1994), the court held that a forum selection clause providing that disputes "shall come within the jurisdiction of the competent Greek Courts" was permissive because "an agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion." *Boutari*, 22 F.3d at 53 (quoting *City of New York v. Pullman*, 477 F. Supp. 438, 442 n.11 (S.D.N.Y. 1979)).  But here, the forum selection clause does more than just confer jurisdiction:  it also waives Beavor's right to challenge the location of the suit and irrevocably submits him to jurisdiction.  Further, *Boutari* is a case where the plaintiff did not sue in the selected forum, and the question was whether the forum selection clause precluded plaintiff's choice.[4]

---

[4] Beavor cites another case involving a similar scenario, *Global Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221 (2d Cir. 2011).  The clause in that case was found permissive because there was no "specific language of exclusion." *Id.* at 225.  It was also a case where the plaintiff did not sue in the selected forum, and the court explained that a permissive forum selection clause "does not deny plaintiff his choice of forum." *Id.*

12

The question here is very different:  Delphi *sued in a selected forum*, and the question is whether Beavor waived his right to challenge Delphi's choice.

Reading the forum selection clause as a whole in light of these authorities, the clause contains specific language of exclusion in the form of Beavor's waiver of venue and *forum non conveniens* objections and his consent to jurisdiction.  Thus, the forum selection clause in the Guaranty is properly viewed as mandatory.  Because this mandatory forum selection clause was reasonably communicated to Beavor and covers the dispute in this case, it is presumptively enforceable.  *Phillips*, 494 F.3d at 383–84.

The fourth step under *Phillips* considers whether Beavor rebutted the presumption of enforceability "by making a sufficient strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  *Id.*  While Beavor does not discuss this fourth prong of *Phillips* directly, he argues that it is unreasonable to enforce a forum selection clause where the controversy "has no substantial nexus to New York."  ECF No. 17 at 26.  Citing state court decisions, Beavor argues that New York has no connection to him, the Guaranty, and the Property.  *Id.* at 26–27.  This argument misses the mark because, as the Second Circuit explained in *Flextronics*, *federal law*, not state law, should be used to analyze step four of *Phillips*.  *Flextronics*, 2023 WL 8270818 at *3.

Under federal law, the presumption of validity may be overcome if (1) the clause's incorporation into the agreement was the result of fraud or overreaching,

(2) the complaining party will for all practical purposes be deprived of his day in court due to grave inconvenience or unfairness of the selected forum, (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy, or (4) the clause contravenes a strong public policy of the forum state.  *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 653 (S.D.N.Y. 2015).  Beavor makes no showing of this nature, and thus fails to rebut the presumption of enforceability under *Phillips*.[5]

Further, even considering Beavor's argument that is grounded in state law, he ignores the nexus between New York and the larger financing transaction of which the Guaranty is an integral part.  As guarantor, Beavor assumed certain obligations created by the Loan Agreement, and the Guaranty incorporated defined terms from the Loan Agreement.  Beavor was no stranger to the Loan Agreement— he signed it on behalf of Borrower.  ECF No. 1-4 at 127.  The Loan Agreement recites that it was "negotiated" in New York, that the loan was made and accepted in New York, and that the loan proceeds were disbursed from New York.  ECF No. 1-4 at 117–18.  Thus, even if it were properly considered, Beavor's argument as to absence of a nexus with New York fails.

---

[5] In a different section of his brief, Beavor asserts that not being able to join the Gryphon Members and others as parties to this suit would "essentially deprive Beavor of his 'day in court'."  ECF No. 17 at 29–30.  First, Beavor waived the right to assert claims for contribution, indemnity or reimbursement.  Guaranty § 3(vi).  Second, even without this express waiver, Beavor never explains why his liability under the Guaranty could not be adjudicated without the joinder of these non-parties.

14

Much of Beavor's brief is spent arguing that the case should be dismissed on *forum non conveniens* grounds. *See* ECF No. 17 at 27–31. Because the forum selection clause is enforceable, Beavor expressly waived any objection "based on venue and/or forum non conveniens." Thus, it is not necessary to consider Beavor's *forum non conveniens* arguments because he waived them.

For the foregoing reasons, the Court should deny Beavor's cross-motion to dismiss on *forum non conveniens* grounds.

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED IN PART AND DENIED IN PART

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *See id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving

15

party.  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper.  *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004).

### A.    Summary Judgment Should Be Granted as to Liability

### 1.    Delphi Makes a Prima Facie Showing of Entitlement to Judgment Under the Guaranty

Under New York law, a plaintiff seeking recovery on a guaranty must come forward with evidence of "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty . . . ."  *Cooperatieve Centrale Raiffeisen-Boerenleenban, B.A. v. Navarro*, 25 N.Y.3d 485, 492 (2015); *Sarfati v. Palazzolo*, 142 A.D.3d 877, 877 (1st Dep't 2016); *see also UMB Bank N.A. v. Bluestone Coke, LLC*, No. 20-CV-2043, 2020 WL 6712307, at *4 (S.D.N.Y. 2020).  "Once the plaintiff establishes its prima facie case, the burden shifts to the defendant to establish, by admissible evidence, the existence of a genuine, triable issue of fact with respect to a bona fide defense."  *E. Cap. Invs. Corp. v. GenTech Holdings, Inc.*, 590 F. Supp. 3d 668 (S.D.N.Y. 2022) (citing *Griffon V LLC v. 11 E. 36th, LLC*, 934 N.Y.S.2d 472, 472 (2d Dep't 2011)).

Here, Delphi makes a *prima facie* showing of entitlement to judgment in its favor by proving the existence of the Guaranty, the underlying debt, and Defendant's non-payment under the Guaranty.  Delphi filed copies of the Loan Agreement, ECF No. 1-4 at 10–198, and the Guaranty, ECF No. 1-5 at 5–18,

16

verified by Jason Mann, Managing Director of ACORE Capital Mortgage, LP (Delphi's authorized agent), based upon his review of Delphi's books and records maintained in the ordinary course of business, Mann. 4/7/2025 Aff. I ¶ 2.  Mann affirms that the Guaranty requires Beavor to pay Delphi the debt amount upon the occurrence of a "Springing Recourse Event," which includes Borrower filing a voluntary bankruptcy petition.  *Id.* ¶ 11.  Mann further affirms that RCC Owner filed a Chapter 11 voluntary bankruptcy petition on February 16, 2024, *id.* ¶ 12, and includes a verified copy of the bankruptcy petition, ECF No. 1-5 at 20–46.

Beavor does not dispute the authenticity of the Loan Agreement or Guaranty, and files his own verified copies of the same.  *See* ECF Nos. 16-5, 16-6.  He also does not dispute that he has not paid the remaining loan balance and interest accrued under the terms of the Guaranty.  Instead, he disputes his obligation to do so.

### 2.    Beavor Has No Viable Illegality Defense to the Guaranty

Beavor argues that the Loan Agreement and the Guaranty are illegal and unenforceable because Delphi is not a licensed "mortgage company" in Nevada and therefore "it is unlawful for [Delphi] to offer or provide any of the services of a mortgage company or mortgage loan originator."  ECF No. 17 at 17 (citing Nev. Rev. Stat. Ann. ("NRS") §§ 645B.900, 645B.910).

Beavor specifically waived the defense of illegality when he executed the Guaranty.  "[A] guarantor cannot assert defenses that it expressly waived in the guaranty agreement."  *HSH Nordbank AG New York Branch v. Swerdlow*, 672 F. Supp. 2d 409, 418 (S.D.N.Y. 2009).  Section 6 of the Guaranty provides:

17

> Guarantor agrees that its obligations under this Guaranty *shall not be released, diminished, or adversely affected* by any of the following, and waives any common law, equitable, statutory or other rights . . . [he] might otherwise have as a result of or in connection with any of the following . . . (e) the *invalidity, illegality or unenforceability* of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with or evidencing the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that . . . (vi) the creation, performance or repayment of the Guaranteed Obligations . . . is illegal, uncollectible or unenforceable.

Guaranty § 6 (emphasis added). This provision specifically precludes any defense premised on illegality of the underlying Loan Agreement and such waivers are enforceable. *See Bank of New York Mellon v. Omega Energy Int'l*, No. 18-CV-9198, 2019 WL 4198676 (S.D.N.Y. Aug. 7, 2019) ("This 'unconditional' guarantee unambiguously rules out 'any defense' premised on the alleged illegality of the Guarantor's obligations.") (citing cases).

In opposition, Beavor cites *In re Republic Airways Holdings, Inc.*, 598 B.R. 118, 146 (Bankr. S.D.N.Y. 2019), for the proposition that an illegality defense cannot be waived. That non-binding decision is distinguishable because the contracts at issue there contained a substantive provision—a liquidated damages clause—that was void as matter of public policy. *See id.* at 145–48. Beavor identifies no such prohibited substantive provision here. Instead, Beavor argues that otherwise valid contractual terms cannot be enforced because Delphi had no Nevada license to "offer or provide any of the services of a mortgage company or mortgage loan originator." ECF No. 17 at 23 (citing NRS § 645B.900).

18

Additionally, Beavor, who bears the burden of proof on this affirmative defense, fails to explain how this statute applies to Delphi. To start, Beavor does not identify which provision of the "mortgage company" definition applies and why.[6] Thus, Beavor makes no prima facie showing that Delphi even fits within Chapter 645B. *See* NRS §§ 645B.0149–018 (application and exceptions). Further, NRS § 86.5483(3) excuses a person who is not "transacting business" in Nevada from complying with Chapter 645B, unless such person engages in other enumerated acts in the state. Significantly, "[c]reating or acquiring indebtedness, mortgages and security interests in real or personal property" does not constitute "transacting business" in Nevada. NRS § 86.5483(1)(g). Indeed, in Section 5.27 of the Loan Agreement, the parties described the factual circumstances leading to the transaction and expressly agreed that Delphi and the Lenders were not doing business in Nevada. Even if he had not waived an illegality defense, Beavor's cursory argument and lack of any real engagement with the scope of Chapter 645B, the express exemption from Chapter 645B provided in NRS § 86.5483(3), or the Loan Agreement provision to the contrary would fail to raise a genuine dispute as to an affirmative defense of illegality.

Finally, a contract prohibited by Chapter 645B is merely "voidable" by the counterparty, not void *ab initio*. *See* NRS § 645B.920. Beavor, who was Borrower's manager for the first eleven months or so under the Loan Agreement, never claims

---

[6] The statute defines a "mortgage company" to include, *inter alia*, a person who "[h]olds himself or herself out as being able to make loans secured by liens on real property." NRS § 645B.0127(1)(c).

19

that Borrower acted promptly to void the Loan Agreement and to return the money that it borrowed.

For the reasons described above, Beavor fails to raise a genuine dispute of material fact with respect to an affirmative defense of illegality.

### 3. Beavor Has No Valid "Collusion" Defense to the Guaranty

Courts applying New York law have repeatedly found that "broad, sweeping and unequivocal language in an absolute and unconditional guaranty . . . forecloses affirmative defenses and counterclaims." *136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding*, 644 F. App'x 10, 12 (2d Cir. 2016) (summary order) (internal quotations omitted). The Guaranty in this case is absolute and unconditional:

> Guarantor hereby *irrevocably and unconditionally* guarantees to [Plaintiff] the payment and performance of the Guaranteed Obligations as and when the same shall be due[.]
>
> This Guaranty is an *irrevocable, absolute, continuing* guaranty of payment and performance and not a guarantee of collection.

Guaranty §§ 1–2 (emphasis added).

Beavor resists summary judgment based on Rule 56(d), which is discussed further below, claiming he has not yet had the opportunity to obtain evidence necessary to mount a defense. He claims that without discovery "it is impossible for Beavor to demonstrate that Delphi colluded with Borrower to secure his default via Borrower's filing of the voluntary bankruptcy and/or executing the change of control." ECF No. 17 at 19. The legal premise of this argument is that Delphi's collusion with the Borrower would prevent enforcement of the Guaranty. Beavor

acknowledges this premise expressly: "If Beavor is able to demonstrate that such collusion occurred, it would serve as a complete defense to his alleged liability under the Guaranty." *Id.*

Beavor's legal premise is incorrect. Simply put, allegations of collusion do not provide a defense to an unconditional guaranty under New York law. To start, Beavor expressly agreed that his obligations under the Guaranty shall not be "released, diminished, or adversely affected by any other action taken or omitted to be taken" with respect to the Loan Documents, the Guaranteed Obligations or the security and collateral therefor "whether or not such act or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms thereof." Guaranty § 6(j). Any claim that Delphi and the Borrower "colluded" to maximize Beavor's liability under the Guaranty falls squarely within this provision. Further, Beavor's argument to avoid the Guaranty runs afoul his assurance in Section 6 that it was his intention that he be obligation to pay the Guaranteed Obligations when due "notwithstanding any occurrence, circumstance, event, action or omission, whatsoever."

Next, the leading case that Beavor cites, *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485 (2015), undermines his core legal contention. In *Navarro*, New York's highest court affirmed the First Department's grant of summary judgment enforcing a guaranty on a motion for summary judgment in lieu of complaint, the same procedural device used to commence this case in state court. In reaching this conclusion, the Court of Appeals rejected the

21

notion of a "categorical exception for collusion claims from the absolute liability provision of the guaranty at issue here." *Navarro*, 25 N.Y.3d at 496. Based on this principle, the court found that defendant's allegations of collusion could not defeat his absolute and unconditional liability on the guaranty, affirming the First Department's grant of summary judgment in the lender's favor.

Despite the holding of *Navarro*, Beavor grounds his claim in *Navarro's* discussion of the Third Department's decision in *Canterbury Realty & Equip. Corp v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102 (3d Dep't 1988), which *Navarro* distinguished. 25 N.Y.3d at 495–96. Claiming that *Canterbury* is "directly on point here" and "particularly instructive," Beavor argues that *Navarro* acknowledged that *Canterbury* stands for the proposition "that an absolute and unconditional guaranty does not foreclose a guarantor's challenge that the creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability." ECF No. 17 at 20–21. But the sentence immediately preceding the sentence from *Navarro* that Beavor references explains that *Canterbury* was a case where "the guarantor argued that the bank *caused the event* that led to the guarantor's liability." *Navarro*, 25 N.Y.3d at 496 (emphasis added). It was the lender's *direct causation* of the event triggering the guarantor's liability that made the difference in *Canterbury*.[7]

---

[7] A review of *Canterbury* reveals how the bank did so: by dishonoring Canterbury's checks, which had been issued with the bank's approval, the bank directly caused Canterbury's suspension of business, which the bank then claimed was justification for acceleration of the debt, which triggered the guaranty. Thus, there was an issue of fact "as to whether the Bank unfairly brought about the occurrence of the very condition precedent

Here, in contrast, there is no claim that Delphi or the Lenders for which it acted directly caused the events triggering the Guaranty. Beavor refers to two triggers: (1) the May 8, 2023 change in control of RCC, and (2) the February 16, 2024 voluntary bankruptcy filing. Beavor admits it was the *Gryphon Members* who directly caused the first triggering event, the change of control. ECF No. 17 at 13. Indeed, he describes a falling out with the Gryphon Members "[b]etween June 2022 and June 2023" due to clashing visions for the RCC Project and allegations of misconduct. ECF No. 17 at 12–13. Additionally, Beavor acknowledges that it was *RCC Owner*, then controlled by the Gryphon Members, that directly caused the second triggering event, the voluntary bankruptcy. *Id.* at 15. There is simply no allegation that the Lenders directly caused these guaranty-triggering events, nor could there be, because only the Gryphon Members had the power to change the manager of RCC and/or RCC Owner, and only the Gryphon Members, who controlled RCC Owner at the time, had the power to cause RCC Owner to file a voluntary bankruptcy petition.[8] There can be no plausible assertion that the Lenders directly caused these events. *See Legal Recovery Assocs. LLC v. Brenes Law Grp., P.C.*, No. 22-CV-1778, 2023 WL 2253138, at *13 (S.D.N.Y. Feb. 13, 2023),

---

(Canterbury's suspension of business) upon which it relied to accelerate the loan against the guarantors." 135 A.D.2d 102, 107.

[8] Another case that Beavor cites concerned a motion to dismiss fraud counterclaims to a foreclosure action when the lender failed to provide the loan proceeds required by contract. *MCC Funding LLC v. Diamond Point Enters., LLC*, 36 Misc. 3d 1206(A), 2012 WL 2537893, at *5 (Sup. Ct. Kings Cty. June 25, 2012). This case has no application here.

*adopted by* 2023 WL 2266534 (S.D.N.Y. Feb. 28, 2023) (the party seeking to avoid enforcement of a broad waiver must "prove the linkage necessary to satisfy the narrow *Canterbury* exception to the usual rule that unconditional guarantees, which include clear waivers of otherwise-applicable defenses, are enforced according to their terms.").

Additionally, the Court of Appeals described *Canterbury* as permitting a guarantor to challenge a creditor's "wrongful" post-execution conduct causing the guarantor's liability. *Navarro*, 25 N.Y.3d at 496. In *Canterbury*, the borrower asserted causes of action for, *inter alia*, breach of contract based on actions the lender took directly. *See* 135 A.D.2d at 105. Thus, the borrower/guarantors identified specific actionable conduct by the lender. Beavor fails to do so here. All that he offers are vague charges of "collusion." But that term is woefully imprecise and fails to distinguish between entirely lawful activity, such as the Lenders negotiating with Borrower and reaching a compromise, and legally "wrongful" action. This lack of precision may explain why the Court of Appeals rejected the "expansive proposition" of a collusion defense to an unconditional guaranty. *Navarro*, 25 N.Y.3d at 495–96.

Eschewing any limiting principle, Beavor appears to contend that any discussion or coordination between the Borrower and Delphi that had the effect of focusing enforcement efforts on him, as opposed to the Borrower or the Property, constituted wrongful collusion. *See* ECF No. 17 at 22 (claiming the Borrower and Delphi colluded to "provide Delphi with an avenue for collection that was not

24

against the Borrower and its assets, including the Property"). However, Beavor expressly waived any right to require Delphi to exhaust remedies against Borrower or to proceed against Borrower's assets before enforcing the Guaranty. Guaranty § 3. He further waived "any right relating to the timing, manner or conduct of [Delphi's] enforcement of rights against Borrower's assets or the collateral pledged by Borrower to secure the Guaranteed Obligations." Guaranty § 3(iii). Thus, Delphi's decision not to pursue the full amount of the Debt in the bankruptcy proceeding or to compromise its claims through settlement cannot be "wrongful" under the Guaranty. *See Hitachi Constr. Mach. Co., Ltd v. Weld Holdco, LLC*, No. 23-CV-1396, 2023 WL 8452389, at *14 (S.D.N.Y. Dec. 6, 2023) ("The flaw in the Weld defendants' argument . . . is that the conduct they claim was 'wrongful' is, in fact, expressly permitted by the Cross Guarantee.").

Finally, all that Beavor offers is speculation that the Gryphon Members must have colluded with the Lenders in some improper way, which he fails to describe. His primary basis for making this claim is the settlement reached in Borrower's bankruptcy, which Beavor characterizes as a "sweetheart deal" between the Borrower (controlled by the Gryphon Members) and the Lenders. It is worth noting that this so-called sweetheart deal was approved by the Bankruptcy Court over Beavor's objections, and it was reached in August 2024, some fourteen months after the first triggering event (the change of control) and some six months after the second triggering event (the voluntary bankruptcy filing). Beavor claims that this court-approved settlement was so manifestly corrupt that the collusion to bring it

25

about must have begun much earlier. But one must wonder why, if the object of the collusion was to maximize Beavor's liability, Delphi did not seek to enforce the Guaranty when, according to Beavor, it was first triggered by the May 2023 change of control, or by the February 2024 bankruptcy filing, but instead waited until April 7, 2025 to file this action in state court, only after reducing Beavor's potential liability by some $47.5 million through payments made in the RCC Owner bankruptcy.

For the reasons described above, Beavor's conclusory claims of collusion raise no viable defense to his liability under the Guaranty.

### 4.    Rule 56(d) Discovery Is Not Warranted

Even if Beavor had described a legally viable "collusion" defense to the Guaranty, which he has not done, Beavor cannot avoid summary judgment for the separate and independent reason that he fails to make a sufficient showing under Rule 56(d). That Rule provides that the Court may deny or defer decision on a motion for summary judgment when the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).

When a party has not had *any* opportunity for discovery, summary judgment is generally premature. *See Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996). However, "the party opposing summary judgment is not automatically entitled to discovery." *Seneca Beverage Corp. v. Healthnow N.Y., Inc.,* 200 F. App'x 25, 27 (2d Cir. 2006); *see also Haran v. Dow Jones & Co., Inc.,* No. 99–9143, 2000 WL 777982,

at \*3 (2d Cir. 2000) (unpublished opinion) (rejecting argument that district court "erred in deciding the motion for summary judgment without providing [plaintiffs] with an opportunity to conduct discovery" because "mere references to the lack of discovery are insufficient . . . plaintiffs failed to identify the specific facts they needed to resist defendants' motion or how those facts would have reasonably created a genuine issue of material fact").

The Second Circuit has explained that the party resisting summary judgment must submit an affidavit showing: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995). Even if the request for Rule 56(d) discovery is properly supported, a district court "may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *Nat'l Union Fire Ins. Co. v. The Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001).

Courts grant additional discovery where the Rule 56(d) affidavit specifically identifies the facts sought and how those facts could demonstrate a genuine dispute of material facts. *See e.g.*, *id.* (granting limited discovery where defendants "seek facts from Mr. Xiji explaining exactly when the Cargo was delivered to Huangpu and what exactly transpired during the carriage of the Cargo"); *Elliot*, 84 F.4th at 493–94 (outlining eighteen categories of discovery and topics to be pursued, including "records, if any, of Cartagena's transmission of the Draft for printing at

27

his complex's concierge," "information concerning the relationship between

Cartagena and R4 So Valid, LLC, the entity to which Elliott's rights to the Song

were purportedly assigned," and "information concerning whether the check Elliott

received was intended by the parties to comprise <u>all</u> of the consideration, which the

Draft does not define").

      Beavor's Declaration submitted in opposition to the Motion falls far short of

these standards.  Indeed, the only statements Beavor makes in support of his need

for discovery are:

> Without discovery, I cannot demonstrate that such
> collusion occurred when RCC Owner first defaulted under
> the Loan and triggered my liability under the Guaranty.
> I also cannot determine whether Delphi has reduced the
> amount of the claim against me by the $5,000,000
> extension payment.
>
> Specifically, I require discovery of all emails, text
> messages, electronic messages, letter correspondence, and
> call logs between Delphi and Borrower and/or the
> Gryphon Members regarding the Loan and the Property
> as well as depositions of Walton, Oleson, Plaintiff's FRCP
> 30(b)(6) designee, and any specific personnel of Plaintiff
> involved in negotiations with RCC Owner.

Beavor Decl. ¶¶ 62–63.  This description of the facts that are sought is not specific

at all—it is literally all communications between "Delphi and Borrower and/or the

Gryphon Members" about the Loan and the Property.  Beavor never specifies what

categories of information this would include or how it would create a genuine

dispute of material fact.  Instead, Beavor effectively asks to rummage through all

communications between the parties about the Loan and the Property in the hope

that some factual or legal theory will present itself.  This is a "fishing expedition in

28

the hope that he could come up with some tenable cause of action." *Waldron v. Cities Serv. Co.*, 361 F.2d 671, 673 (2d Cir. 1966), *aff'd sub nom.*, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968); *see also Halebian v. Berv*, 869 F. Supp. 2d 420 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013) (denying motion for discovery because the litigant's "apparent inability to identify the facts that he seeks with any particularity reveals that his motion for discovery is a *de facto* application for a fishing expedition").

Additionally, Beavor's declaration is insufficient because it makes no effort to address two of the factors described in *Meloff*, namely "what effort affiant has made to obtain them," and "why the affiant was unsuccessful in those efforts." Notably, Beavor has been in arbitration over BCM's removal as manager since 2023. While Beavor's Declaration refers to that arbitration, he does not claim that he sought discovery about the circumstances of his removal, including whether the Lenders played any role in it. Similarly, Beavor appeared and participated in the RCC Owner bankruptcy proceeding to oppose court approval of the settlement with Delphi that he calls a "sweetheart deal." Bankruptcy Rule 2004 allows "any party in interest," a term that would include the former manager and 10% beneficial owner of the debtor, to seek examination of the "acts" and "conduct" of the debtor and "any matter which may affect the administration of the debtor's estate, or to the debtor right to a discharge." Fed. R. Bankr. P. 2004(b). Rule 2004 would allow examination of whether Borrower had improperly colluded with the Lenders to file a voluntary petition or to reach the "sweetheart deal" that was presented for court

29

approval.  Indeed, Bankruptcy Rule 2004 has been described as authorizing a "fishing expedition" and discovery broader than that permitted by the Federal Rules of Civil Procedure.  *See, e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991).  Yet Beavor does not claim he ever sought to avail himself of Bankruptcy Rule 2004 to obtain the information he claims he needs now, and fails to explain why any such efforts were unsuccessful.

For these reasons, Beavor's request for discovery under Rule 56(d) should be denied.

### B.     Summary Judgment Should Be Denied as to the Quantum of Damages

Delphi has not met its burden to establish the absence of any genuine issue of material fact as to the quantum of damages.  Delphi claims that it is entitled to damages in the amount of $69,628,721.49, plus interest, attorney's fees, costs, disbursements, and all other applicable charges.  ECF No. 1-3 at 18.  Resolving all ambiguities in Beavor's favor, Delphi fails to show the absence of a genuine dispute as to whether $69,628,721.49 is the correct sum.

Delphi submits that the original principal amount of the loan was $138,371,187.00.  Mann. 4/7/2025 Aff. I ¶ 7.  Pursuant to settlement, Delphi received a secured claim of $47,500,000.00, which the Borrower repaid in an initial $10,000,000.00 installment and a final $37,500,000.00 installment, plus a $5,000,000.00 payment as consideration to extend the deadline to pay the final installment.  *Id.* ¶¶ 14, 18.

Delphi states that $69,628,721.49 is the sum "due pursuant to the Guaranty, as reduced by the payment made by Borrower to Delphi under the Settlement Agreement." ECF No. 1-3 at 18. Delphi further claims that this figure was reached by adding "the principal amount due under the Loan Agreement, the Notes, and the Guaranty (after subtracting the amount Borrower paid Delphi in connection with the Secured Claim pursuant to the Settlement Agreement)" as of March 10, 2025, which was $41,091,909.85, plus "accrued interest at the default rate of $28,536,811.64[.]" Mann. 4/7/2025 Aff. I ¶ 25.

Beavor questions how these damages were calculated, raising at least one specific material factual question that has not been answered definitively on the summary judgment record. In particular, Beavor questions whether the $5,000,000.00 payment made to extend the deadline for the second settlement payment was applied to the outstanding loan balance. ECF No. 17 at 16–17.[9] Despite being on notice that Beavor had raised this question as to the quantum of damages, Delphi did not specifically address this issue in its reply, nor did Delphi address whether it would be appropriate to apply this payment to reduce the loan balance.

Instead, Delphi submitted a "Payoff Statement," which purports to show the total payoff amount as of March 10, 2025. ECF No. 23-1. But this document does not eliminate any genuine issue of material fact. The document does not reflect the

---

[9] "I also cannot determine whether Delphi has reduced the amount of the claim against me by the $5,000,000 extension payment." Beavor Decl. ¶ 62.

31

$41,091,909.85 figure that Delphi claims is the principal amount due.  Nor does the document reflect what Delphi included in the "amount Borrower paid Delphi in connection with the Secured Claim pursuant to the Settlement Agreement."  As all ambiguities must be resolved in Beavor's favor, Delphi fails to demonstrate the absence of a genuine dispute of material fact as to the amount owed on the Guaranty.

For the reasons described above, the Court should deny summary judgment as to the quantum of damages, and the parties should engage in very limited discovery on this issue.

## V.    CONCLUSION

For the reasons described above, the undersigned respectfully **RECOMMENDS** that Delphi's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, and that Beavor's cross-motion to dismiss be **DENIED**.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections.  *See* Fed. R. Civ. P. 6(a), (b), (d).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, United States Courthouse, 500 Pearl Street, New

York, New York 10007-1312.  Any requests for an extension of time for filing objections must be directed to Judge Berman.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: December 22, 2025
      New York, New York

Henry J. Ricardo
United States Magistrate Judge

33